UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| VICKY STUDDARD, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 4:10-CV-2229 (CEJ) ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

**I. Procedural History**

On July 28, 2006, plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. (Tr. 125-29). Plaintiff claims she has been disabled and unable to work since May 24, 2006. Id. Following the initial denial of plaintiff's application on September 15, 2006, plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 90-96).

A hearing was held before an ALJ on June 16, 2008. (Tr. 69-81). The ALJ issued a written decision denying plaintiff's claims on June 9, 2009. Id. On review, the Appeals Council remanded plaintiff's claim for further development of the medical record through June 30, 2008, plaintiff's last-insured date. (Tr. 82-87).

A second hearing before the ALJ was held on August 19, 2009. (Tr. 26-57). The ALJ issued a second written decision denying plaintiff benefits on January 22, 2010. (Tr. 11-21). The Appeals Council denied plaintiff's request for review on October 27,

2010. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Application Documents and Work History

The administrative record establishes that plaintiff was born on September 26, 1961 was 47 years old at the time of the August 19, 2009 hearing. (Tr. 31-34). She lived with her husband and one of their three adult children in Sullivan, Missouri. Id. Plaintiff graduated from high school, completed one year of post-secondary education, and was certified as a medical technician. Id. Plaintiff had worked as a cashier and, more recently, as an aide in a nursing home from 1999 to 2003. (Tr. 156). Plaintiff had not worked since May 2003, and she claimed to have been disabled beginning May 24, 2006 due to pain in her back, lower extremities and left shoulder, obesity, diabetes mellitus,[1] degenerative disc disease, and depression. (Tr. 28-52, 155).

### B.  Medical History

The relevant medical record begins with an examination on January 18, 2005, by Hany Salama, M.D. (Tr. 238). Plaintiff complained of leg cramps and back pain. Dr. Salama's records indicate that plaintiff had several chronic conditions including hypertension, high cholesterol, Type II diabetes, morbid obesity and insomnia with sleep apnea. Her height was noted to be 5' 7" and she weighed 363 pounds.

On April 6, 2005, plaintiff established primary care with Matt Tiefenbrunn, M.D. (Tr. 284). Dr. Tiefenbrunn noted that plaintiff had questions about disability and was currently working with an attorney to apply for disability. Dr. Tiefenbrunn examined

---

[1]Diabetes mellitus is non-insulin dependent (Type II) diabetes.

plaintiff again on May 4, 2005.  (Tr. 283).  He noted that plaintiff had lost nine pounds and was tolerating her medication without side effects.  Dr. Tiefenbrunn's notes indicate plaintiff denied any parethesias,[2] motor weakness or sensory loss in her upper extremities.  On June 6, 2005, Dr. Tiefenbrunn noted trace edema in plaintiff's lower extremities and discussed continued weight loss and medication adjustment with plaintiff.  (Tr. 285).  On August 5, 2005, plaintiff was seen again by Dr. Tiefenbrunn for a follow-up and refill of her medications.  Id.  Dr. Tiefenbrunn noted plaintiff had lost approximately 25 pounds and was in no obvious physical discomfort or distress.

On October 2, 2005, plaintiff was admitted to the hospital after she fell and injured her left shoulder.  (Tr. 253).  An x-ray of her left shoulder showed no fracture or dislocation.  She was diagnosed with a shoulder sprain and was discharged with pain medication.  Plaintiff was seen by Dr. Tiefenbrunn on October 5 and 12, 2005 for continued pain in her left shoulder.  (Tr. 282, 286).  A radiological report from October 17, 2005 indicated mild to moderate joint degeneration, but no fracture or dislocation.  (Tr. 264).

On February 6, 2006, Dr. Tiefenbrunn examined plaintiff and noted plaintiff was frustrated with her inability to lose weight due to lack of dietary discretion.  (Tr. 279).  No other acute problems were noted.  Plaintiff was again seen by Dr. Tiefenbrunn on

---

[2]Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body.
Chronic paresthesia is often a symptom of an underlying neurological disease or traumatic nerve damage.  See  http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited March 7, 2012).

May 17, 2006. (Tr. 280). He noted no acute complaints and continued to recommend diet and exercise.

Plaintiff established primary care with Felipe Eljaiek, M.D. on August 8, 2006. (Tr. 305). Dr. Eljaiek noted plaintiff's previous diagnoses and discussed with plaintiff the possibility of gastric bypass surgery. On April 26, 2007, Dr. Eljaiek examined plaintiff, found nothing acute, and encouraged her to exercise and lose weight. (Tr. 313).

Plaintiff continued to have her blood work monitored and medications refilled. (Tr. 314-335). It appears plaintiff was seen on March 24, 31, and April 7, 2008 at Patients First Health Care, however, these records do not indicate that plaintiff was examined by a physician or other medical professional on those dates. (Tr. 314-16).

Dr. Eljaiek examined plaintiff on September 8, 2008. (Tr. 390). Dr. Eljaiek's report indicates no swelling, no back, joint, or neck pain, no anxiety and no sleep problems. Dr. Eljaiek recommended plaintiff continue her same medical management plan and medications and encouraged plaintiff to lose weight. Another examination on September 18, 2008 contained similar observations. (Tr. 392). Although three reports from Dr. Eljaiek's office dated September 8 and 18, 2008 and January 26, 2009 indicate that plaintiff was working in a hospital, plaintiff's Social Security records do not indicate that plaintiff was newly-hired or earned income from May 2003 through July 2009. (Tr. 143-51).

On October 15, 2008, plaintiff underwent a consultative examination by Barry Burchett, M.D. (Tr. 338-60). X-ray images were taken of plaintiff's back, right foot, left knee, and left shoulder. Dr. Burchett confirmed plaintiff's previously-diagnosed conditions and determined that plaintiff would be able to lift 10 pounds continuously,

20 pounds occasionally, sit for three hours and stand for one hour without interruption, sit for eight hours and stand for two hours in an eight-hour work day, would be unable to reach overhead with her left arm, and could ambulate without assistance, but could only occasionally stoop or climb stairs and never balance, climb ladders, kneel, crouch or crawl.

On November 10, 2008, plaintiff underwent a consultative psychological evaluation by Paul Rexroat, Ph.D. (Tr. 363-75). Dr. Rexroat found plaintiff to be of average intelligence and limited only mildly in her ability to socially interact with others on account of mild recurrent depression that was moderately well-controlled with medication.

Plaintiff was examined by Dr. Eljaiek on January 26, 2009. Dr. Eljaiek noted plaintiff's complaint of lower-back pain. ( Tr. 393). It was recommended that plaintiff continue to lose weight and have an MRI if her symptoms did not improve. On February 5, 2009, plaintiff was seen for a follow-up after an MRI. (Tr. 394). Dr. Eljaiek noted some narrowing at the L3-4 level due to degenerative disc disease and recommended physical therapy, a Lidocaine[3] patch for pain, and weight loss--possibly through gastric bypass. Dr. Eljaiek examined plaintiff again on February 23 and March 25, 2009, for a preoperative evaluation for gastric bypass surgery. Plaintiff was cleared to proceed with gastric bypass surgery.

Plaintiff was seen on February 24, 2009 by Naseem Shekhani, M.D., P.C., for physical therapy. (Tr. 376). Dr. Shekhani noted that plaintiff was experiencing back

---

[3]Lidocaine is a local anesthetic often administered through a transdermal patch. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html. (last visited March 8, 2012).

pain that was negatively affecting her ability to ambulate.  (Tr. 376).  Dr. Shekhani administered an epidural injection[4] and instructed plaintiff on a home exercise and stretching program.  Dr. Shekhani administered a second epidural injection on March 10, 2009.  (Tr. 379).  On March 24, 2009, Dr. Shekhani again note plaintiff's difficulty in ambulation and prescribed plaintiff Vicodin[5] as her pain was not controlled.  (Tr. 381).  On April 21, 2009, Dr. Shekhani noted plaintiff's difficulty with ambulation and described her pain as mild, but increasing with activity.  (Tr. 382).  On May 19 and June 30, 2009, Dr. Shekhani made the same observations and refilled plaintiff's Vicodin prescription.  (Tr. 383-84).

On July 6, 2009, Dr. Eljaiek completed a medical source report of work-related limitations for plaintiff.  (Tr. 385).  Dr. Eljaiek opined that plaintiff could lift 20 pounds occasionally, lift less than 10 pounds frequently, could stand and sit less than 2 hours in an eight-hour work day, would have to lie down at unpredictable intervals during work, and would have to miss work more than 3 times per month due to her impairments.

On July 17, 2009, plaintiff underwent a lower extremity perfusion study and was found to have moderate circulation impediment in her legs. (Tr. 398). In a follow-up appointment with Dr. Shekhani on July 28, 2009, plaintiff's difficulty with ambulation was noted and her pain was again described as mild but increasing with activity.  (Tr.

---

[4]An epidural steroid injection (ESI) is the delivery of powerful anti-inflammatory medicine directly into the space outside of the sac of fluid around the spinal cord.  See http://www.nlm.nih.gov/medlineplus/ency/article/007485.htm (last visited March 7, 2012).

[5]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

401). Dr. Shekhani recommended home exercise and stretching and refilled plaintiff's Vicodin prescription.

Finally, on August 17, 2009, Dr. Eljaiek completed a Missouri state of disability form for plaintiff for the purposes of securing a disabled person's license plate, checking a box indicating that plaintiff was unable to ambulate without an assistive device and that this disability was permanent. (Tr. 402).

C. The June 16, 2008 Hearing

At a hearing before the ALJ on June 16, 2008, plaintiff testified, in relevant part, that: she was able to lift a gallon of milk with both hands, she dropped things frequently due to lack of hand strength; she has trouble being on her feet for any length of time, and that she has to adjust positions frequently while sitting due to back pain. (Tr. 60-66).

D. The August 19, 2009 Hearing

Another hearing was held on August 19, 2009 before an ALJ. (Tr. 28-57). Plaintiff testified, in relevant part: she could only walk 50 feet at a time; could only stand 4-5 minutes at a time; could only sit 10-15 minutes at a time without changing positions; she cannot lift more than 10 or 15 pounds; she could not undergo gastric bypass surgery because her medical insurance ran out; she was in constant pain; she was able but limited in her ability to cook, do laundry, shop and drive; and that she frequently drops things.

Jeffrey Magrowski, Ph.D., also testified at plaintiff's hearing as a vocational expert. (Tr. 53-56). In the first hypothetical, the ALJ described an individual of the same age, education and work experience as plaintiff and was limited to sedentary work that allowed her to rotate positions frequently; could never climb stairs, ramps,

ropes, ladders or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl, was limited to only frequent overhead reaching on with her left arm; and should avoid concentrated exposure to cold, wetness, unprotected heights, hazardous machinery, excess humidity and even moderate heat.  Dr. Magrowski testified that such an individual could not perform plaintiff's past work, but could perform other jobs that existed in the local and national economy.  In a second hypothetical, the ALJ added that the individual required a cane to assist with ambulation and could only occasionally reach overhead with her left arm.  Dr. Magrowski testified that these additional limitations would not preclude the work opportunities available under the first hypothetical.  In a third hypothetical, the ALJ added that the individual would have to elevate her legs for up to four hours a day,  and Dr. Magrowski testified that there were no jobs that could be performed by this individual.  Finally, in response to questioning by plaintiff's counsel, Dr. Magrowski testified that an individual who was limited to sedentary exertion, who could only occasionally push, pull, and reach,  and never reach overhead, would be precluded from employment.

### IV.  The ALJ's Decision

In the decision issued on January 22, 2010, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2008.

2. Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of May 24, 2006 through her date last insured of June 30, 2008.

3. Plaintiff, through the date last insured, had the following severe impairments: degenerative disc disease, degenerative joint disease, morbid obesity, and diabetes mellitus.

4. Plaintiff, through the date last insured, did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff, through the date last insured, had the residual functional capacity to perform sedentary work which allows for frequent rotating of position and use of a cane to assist with ambulation; no climbing of ramps, stairs, ropes, ladders, and scaffolds; no crouching; only occasional balancing, stooping, kneeling, crawling, and reaching overhead with the upper left extremity; with need to avoid concentrated exposure to extreme cold, wetness/humidity, and industrial hazards/unprotected heights; and, with need to avoid moderate exposure to extreme heat.

6. Plaintiff was unable to perform her past relevant work through the date last insured. (20 C.F.R. 404.1565 and 416.965).

7. Plaintiff was born on September 26, 1961, which is defined as a younger individual age 18-44 on the date last insured.

8. Considering plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed through the date last insured.

9. Plaintiff was not under a disability as defined in the Social Security Act at any time from May 24, 2006, the alleged onset date, through June 30, 2008, the date last insured.

(Tr. 11-21).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so

-10-

that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B.     Analysis

Plaintiff alleges the following errors by the ALJ warrant remand or reversal: (1) the ALJ's assessment of plaintiff is not supported by substantial evidence; and (2) that, because the hypothetical posited to the vocational expert failed to capture the concrete consequences of plaintiff's impairments, the testimony by the vocational expert is insufficient evidence to support the ALJ's determination that plaintiff could engage in gainful activity.

#### 1.     Residual Functional Capacity Determination

A claimant's residual functional capacity (RFC) is what she can do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of her limitations. Id. The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by some "medical evidence that addresses claimant's

'ability to function in the workplace.' " Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)).

The ALJ found that plaintiff was limited to only sedentary work, that she would need to change positions frequently, that she would require a cane to ambulate, and that she would be subject to significant postural limitations, including only occasional overhead reaching with her left arm. Plaintiff asserts that the RFC found by the ALJ is not supported by at least some medical evidence or was based upon an improper review of the medical evidence.

In evaluating medical evidence, it is the ALJ's function to resolve conflicts among "the various treating and examining physicians." Bently v. Shalala, 52 F.3d 784 (8th Cir. 1995) (internal citation omitted).  Generally, the opinion of a treating physician is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other sustainable evidence in the record.  20 C.F.R. § 404.1527(d)(2), 416.927(d)(2).  Further, a treating physician's opinion is generally given deference over those of consulting physicians. Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir.1991). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).  "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.2001).  "Moreover, a treating

-12-

physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." Hamilton, 518 F.3d at 610.

Plaintiff first argues that the RFC determined by the ALJ was contrary to the medical evidence because it did not include the recommendation by Dr. Burchett that plaintiff never reach overhead with her left arm. The Court disagrees. While Dr. Burchett's limitations report indicated that plaintiff could never reach overhead with her left arm, his examination reports found plaintiff to have full strength in her upper extremities and full range of motion in her left shoulder. X-rays of plaintiff's left shoulder also showed mild to moderate joint degeneration but no fracture, dislocation or other structural damage. In addition, none of plaintiff's treating physicians opined that plaintiff could never reach overhead with her left arm and plaintiff had not seen a specialist or undergone any treatment intended to improve the functionality of her left shoulder. In fact, there is no evidence that plaintiff was seen by *any* physician between April 26, 2007 and September 8, 2008. The medical source assessment of plaintiff's work-related limitations completed by plaintiff's treating physician on July 6, 2009, did not prohibit plaintiff from overhead reaching. Under these circumstances, the ALJ's rejection of Dr. Burchett's October 15, 2008 overhead-lifting limitation as inconsistent with the medical record is supported by substantial evidence.

Plaintiff next argues that the RFC determined by the ALJ failed to give controlling weight to plaintiff's treating physicians, Dr. Shekhani and Dr. Eljaiek. While the reports of Dr. Shekhani and Dr. Eljaiek from 2009 do indicate a greater level of impairment than was found by the ALJ, the ALJ did not err in discrediting these reports in favor of medical reports made closer in time to June 30, 2008, the date on which plaintiff last met the insured status requirements of the Social Security Act. With the exception of

the overhead-lifting limitation discussed above, the RFC found by the ALJ was equally or more restrictive than the limitations recommended by Dr. Burchett as of October 15, 2008.  The medical records prior to Dr. Burchett's consultive examination, including two examinations by plaintiff's treating physician on September 8 and 18, 2008, do not describe any work-related limitations that are inconsistent with Dr. Burchett's report. Moreover, plaintiff's treating physicians consistently recommended throughout the medical record that plaintiff get more exercise.  See Moore v. Astrue, 572 F.3d 520 (8th Cir. 2009) ("A lack of functional restrictions on the claimant's activities is inconsistent with a disability claim where, as here, the claimant's treating physicians are recommending increased physical exercise").  Although medical records outside of the relevant period may be probative as to plaintiff's condition before June 30, 2008, see Tilley v. Astrue, 580 F.3d 675 (8th Cir. 2009), the ALJ did not err in relying upon a consultative examination that was completed closer in time to June 30, 2008 and was consistent with the medical record during the relevant period.  Id.

Plaintiff's next contention-- that the ALJ failed to consider the limiting effect of plaintiff's obesity-- is also without merit.  The ALJ found plaintiff's obesity to be a severe impairment and, in determining plaintiff's RFC, stated "[plaintiff's] most significant problem appears to be her obesity which produces the limitations contained in her [RFC]."  (Tr. 19).  Thus, it is clear that the ALJ properly considered the limiting effects of plaintiff's obesity even though the ALJ discredited plaintiff's testimony about the intensity and severity of her limitations. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) ("If an ALJ explicitly discredits a claimant's testimony and gives good reason for doing so, we will normally defer to that judgment.").

-14-

Finally, plaintiff argues that the ALJ failed to consider objective medical evidence that supports her subjective complaints of pain.  The medical evidence relied upon by plaintiff-- her long-term Vicodin prescription, physician's observations, and disabled person's vehicle license--were all based upon examinations that occurred at least 6 months after June 30, 2008.  During and shortly after the relevant period, however, plaintiff's treating physicians consistently observed that plaintiff was not in acute pain or distress.  Again, the medical record does not show that plaintiff was even seen by a physician between April 26, 2007 and September 8, 2008.  Thus, the ALJ did not err in failing to credit those portions of medical record that tended to corroborate plaintiff's subjective complaints of pain as inconsistent with the medical record during the relevant period.  See McCoy v. Astrue, 648 F.3d 605 (8th Cir. 2011) ("complaints of disabling pain are inconsistent with repeated observations from treating and consultative physicians that [plaintiff] was not in acute pain or distress.").

### 2. Plaintiff's Ability to Perform Other Work

In the final step of the disability analysis, the ALJ correctly relied upon the testimony of a vocational expert in determining that, while plaintiff could not preform her past work, she would be able to perform other available gainful activity. "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." Cox v. Astrue, 495 F.3d 614, 620  (8th Cir. 2007).  The second hypothetical posed to the vocational expert accurately reflected the RFC found by the ALJ, which was supported by substantial evidence.  The vocational expert testified that such an individual would not be precluded from several jobs that existed in the national and local economy.  Thus, the ALJ's finding that

plaintiff was able to engage in gainful activity as of June 30, 2008 is also supported by substantial evidence.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #18] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 14th day of March, 2012.